## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL SADEL** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **09-612** |
| | : | |
| **BERKSHIRE LIFE INSURANCE** | : | |
| **COMPANY OF AMERICA, et al.,** | : | |
| **Defendants.** | : | |
| | : | |

**Goldberg, J.**                                                                                   **January 28, 2011**

### MEMORANDUM OPINION

Plaintiff, Michael Sadel, brings claims against Defendants, Berkshire Life Insurance Company of America (Berkshire) and the Guardian Life Insurance Company (Guardian),[1] for breach of contract and bad faith based on a failure to pay disability insurance benefits under two individual disability policies.[2] Defendants counter-claimed for declaratory relief seeking rescission of the two policies, alleging fraudulent statements made by Plaintiff on the disability insurance applications.

Before the Court are Defendants' motion for summary judgment, Plaintiff's counter motion for partial summary judgment, and Defendants' motion in limine to preclude the testimony of Plaintiff's expert. For the reasons stated below, I will grant Defendants' motion for summary

---

[1]Berkshire is a wholly owned subsidiary of Guardian. (Defs.' Br. Summ. J. n. 1.)

[2] Plaintiff states in his Response to Defendants' Motion for Summary Judgment that this action arises out of a claim for disability income benefits pursuant to two disability insurance policies purchased from Defendant Berkshire "*and for a waiver of premiums pursuant to a life insurance policy*" purchased from Guardian. (Pl.'s Br. Summ. J. 3; Pl.'s Additional Undisputed Facts ¶ 1) (emphasis added). However, the complaint does not request such relief, nor does it appear that the waiver of premiums is at issue. (See infra note 4.)

judgment and deny Plaintiff's motion for partial summary judgment. Defendants' motion in limine will also be denied.

## I. FACTS AND PROCEDURAL HISTORY

A. <u>Relevant Facts</u>

Unless otherwise specified, the following facts are undisputed.

Plaintiff is a licensed pharmacist who, in 2002, was the sole proprietor of two pharmacies in North Philadelphia. In September of 2002, Plaintiff sought treatment with Linda May, a licensed clinical social worker, reporting to her that he had been abusing opiates including Percocet, Oxy Contin, Vicodin, Lorcet, Xanax and Soma. Plaintiff indicated he had been taking these unprescribed narcotics from his pharmacy's supply for about three months. (Pl.'s Br. Summ. J. 3; Defs.' St. of Facts ¶¶ 89, 98.)[3]

May opined that Plaintiff had a "substance abuse disorder" and thereafter Plaintiff began individual therapy sessions with May which continued through February 8, 2006. Plaintiff also began group sessions in May 2003, which were ongoing as of the date of the summary judgment submissions. (Pl.'s Br. Summ. J. 4; Defs.' Br. Summ. J. 11, 12.) A mandatory requirement for admittance into the group sessions (conducted by May), was that the patient have some sort of substance problem. (Defs.' St. of Facts ¶ 118.)

Plaintiff alleges that May never issued a formal diagnosis and that he did not go through any detoxification program. He further notes that only the first two weeks of his time with May

---

[3] "Plaintiff's Brief in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment, and Plaintiff's Counter-Motion for Partial Summary Judgment" will be cited to as "Pl.'s Br. Summ. J." and "Defendants Berkshire Life Insurance Company of America and the Guardian Life Insurance Company's Brief in Support of Defendants' Motion for Summary Judgment, or in the alternative, Summary Adjudication" as "Defs.' Br. Sum. J."

pertained to his drug use and that his treatment evolved into addressing other personal problems. (Pl.'s Br. Summ. J. 3-4.)

B. Plaintiff's Insurance Policies

In January of 2005, Plaintiff purchased a disability insurance policy from Berkshire through its agent Jason Giorgio. Giorgio filled out Plaintiff's disability insurance application based on information provided by Plaintiff. (Pl.'s Br. Summ. J. 5.) Plaintiff responded "no" to the following three questions asked by Giorgio: (1) "Have you ever used stimulants, hallucinogens, narcotics or any other controlled substance?"; (2) "Have you ever had or been advised to have counseling or treatment for alcohol or drug use?"; and (3) "In the last ten years, have you had, been treated for or received consultation or counseling for anxiety, depression, nervousness, stress, mental or nervous disorder, or other emotional disorder?" (Application for Disability Income, Policy Number Z0713330, Questions 5(k)(I), 5(k)(ii), 5(g)(x)).

Plaintiff alleges that he did not disclose that he had ever used controlled substances, obtained counseling for drug use, or received treatment for emotional disorders because his drug abuse and treatment were not on his mind as he "breezed through" the questions with Giorgio. Plaintiff explains that his treatment with May was a small matter that occurred years prior to his applying for insurance and had been addressed in just a few weeks. Additionally, he claims that he was embarrassed about his treatment and wanted to keep it confidential because of the stigma in society associated with non-prescription drug use. (Pl.'s Br. Summ. J. 5.)

After Giorgio completed the application, he mailed it to Plaintiff for his signature. On January 18, 2005, Plaintiff signed the application, which read: "Those parties who sign below, agree that . . . All of the statements that are part of the application . . . are correctly recorded, and are

complete and true to the best of the knowledge and belief of those persons who made them." (Defs.'

Br. Summ. J. 7, Ex. A, p. 02104, "Representations of the Proposed Insured and Owner.")[4]

The disability insurance policy - No. Z0713330 - was issued on February 5, 2005. (Pl.'s Br.

Summ. J. 5.) The policy contains an "Incontestable" provision which states that: "This policy will

be incontestable as to the statements, except fraudulent statements, contained in the application after

it has been in force for a period of two years during your lifetime." (Policy No. Z0713330, 9.) The

policy also contained a Future Increase Rider Option (FIRO) which allowed Plaintiff to apply for

additional coverage during an annual option period without medical underwriting. (Pl. Memo

Summ. J. 4-5.)[5]

---

[4]Plaintiff also met with a medical examiner during the application process. He testified that he vaguely recalled answering questions posed by the examiner but did not recall answering specific questions. The questions addressed drug abuse, drug treatment and treatment for emotional issues through a "Representations to the Medical Examiner" form (Medical Representations Form). All of the answers on this form, which Plaintiff signed, were "no." (Defs.' St. of Facts ¶¶ 66-70; Medical Representation Form, Questions 3(x), 7(I), 7(ii).)

[5]Plaintiff also purchased a life insurance policy from Defendant Guardian. In purchasing this insurance, Plaintiff signed a "Health and Personal History of Proposed Insured" form (Health Form), in which he again affirmed that he had never used controlled substances, had not been treated for drug use, and had not been treated for emotional problems. (Defs.' Br. Summ. J. 2, 4; Health Form Questions 3(J), 7-A, 7-B.) In signing the form, Plaintiff represented that "all the statements and answers above are complete and true to the best of my knowledge and belief." (Defs.' Br. Summ. J. 8; Defs.' St. of Facts ¶¶ 72-82.) Defendant claims that based in part on the Health Form, Guardian issued the Life Insurance Policy on March 2, 2005. (Defs.' Br. Summ. J. 2, 4.) On February 24, 2009, Guardian determined that Plaintiff was disabled under its policy and provided a refund of premiums owed for the relevant period. (Pl.'s Br. Summ. J. 8.)

Guardian acknowledges that the incontestable clause in the life insurance policy is two years and does not include a fraud exception. Consequently, Guardian does not challenge the validity of the life insurance policy. (Defs.' Opp. to Pl.'s Counter -Motion for Summ. J. 15.) Therefore, the issues before me pertain only to the Berkshire Disability Policy. Nonetheless, Plaintiff claims that Guardian, as the parent company of Berkshire, remains liable for Berkshire's refusal to honor the disability contract. (Defs.' Br. Summ. J. 4-5.)

C.  Plaintiff's Claim for Disability Benefits

On January 13, 2007, Plaintiff was the unfortunate victim of an armed robbery at one of his pharmacies where he was shot in the hand as he attempted to move a gun away from his head. Plaintiff's three middle fingers on his left hand were amputated, and his thumb and pinky finger were injured.  He was hospitalized at Thomas Jefferson Hospital and, upon arrival, Plaintiff advised the emergency room physicians that he had taken unprescribed narcotics in the past.  He provided this information because he was afraid the hospital would prescribe him pain medication which could cause a relapse.  (Pl.'s Br. Summ. J. 5-6.)

Plaintiff returned to work three weeks after the shooting, working approximately 2-3 days per week, 7 hours per day.  He claims that he suffered from extreme stress, fear and anxiety and that he was limited in his work functions.  Plaintiff hired two pharmacy technicians for assistance, an armed security guard to protect himself, his employees and inventory, and discontinued Saturday store hours.  (Pl.'s Br. Summ. J. 6.)

In addition to his continuing group therapy, Plaintiff resumed his individual counseling with May on January 25, 2007, where he was diagnosed with post-traumatic stress disorder.  (Pl.'s Br. Summ. J. 7.)  In the first individual session after his injury, May wrote in her chart notes:  "insurance claim, lied on application for the policy, Chuck found examples of exceptions."   When asked why she wrote the note, May testified: "I wrote that because he told me that he had lied on his application for his disability policy, that he had indicated that he never had a problem with drugs, and I didn't know that."  She continued:  "Michael lied."  (Defs.' Br. Summ. J. 9; Defs.' St. of Facts ¶¶ 83, 84.)

In February 2007, the option to exercise the Future Increase Option (FIO) of Plaintiff's disability insurance became available.  Again, Berkshire agent Giorgio completed the application

based on information provided by Plaintiff.  The application indicated that Plaintiff was working full

time, and that he was not disabled.  Plaintiff alleges that he believed that this information was correct

because he had assumed full administrative duties and his job was "24/7."  He claims he did not

know what the term "disabled" meant but he did not think it applied to him because he was working.

Giorgio mailed the application to Plaintiff, which he signed on February 6, 2007.  The policy

doubled Plaintiff's indemnity benefits.  It included an "Endorsement Amending 'Incontesable'

Provision" which stated:

> In consideration of the issuance of this policy it is understood and
> agreed that, except for representations made at the time of exercising
> the Future Increase Option to purchase this policy, the time period
> stated in the incontestable provision of this policy will be measured
> from the effective date or from the date of last reinstatement, if later,
> of the policy to which the Future Increase Option Rider is attached.

(Pl.'s Br. Summ. J. 6; FIO Policy.)

Plaintiff continued working at the pharmacy until June of 2007 when a customer approached

him from behind and said "stick 'em up."  Plaintiff claims he saw his life flash before his eyes and

he realized he could no longer work at the pharmacy.  On August 16, 2007, Plaintiff telephoned

Berkshire to put them on notice of a disability claim.  In May of 2008, he sold one of his pharmacies.

(Pl.'s Br. Summ. J.  7.)

According to Defendants, on August 20, 2007, four days after receiving Plaintiff's claim,

Berkshire sent Plaintiff a "Claim Form" and an "Attending Physician's Statement" (APS) with a

letter stating the importance of providing the information that supported his claim.  Berkshire claims

to have contacted Plaintiff many times attempting to acquire this information.  On November 12,

2007, Berkshire received notice that Plaintiff had retained counsel.  Thereafter, on December 24,

2007, Berkshire received Plaintiff's Claim Form, four months after it was requested. On the Claim Form, Plaintiff indicated he was totally disabled as of June 2007 but also stated that he was working fifteen hours a week, performing duties that were part of his occupation. (Defs.' Br. Summ. J. 5.)

On January 28, 2008, Berkshire claims adjuster, Kelly Reagan, obtained Plaintiff's medical records from Thomas Jefferson Hospital, which reflected that Plaintiff had a history of opiate dependency, and attachment and adjustment disorders for which he obtained outpatient therapy. After spending several months attempting to obtain May's treatment notes, Berkshire received a report and chart prepared by May indicating that she began treating Plaintiff in September 2002 for narcotics use. The chart established that May had fifty-seven individual and seventy-eight group treatment sessions with Plaintiff between September 2002 and the date the Disability Application was signed - January 18, 2005. (Defs.' Br. Summ. J. 5)

On June 9, 2008, Reagan notified Plaintiff that Berkshire had found inconsistencies in his policy application. Reagan also forwarded a memorandum on this issue to Defendant's legal department. (Pl.'s Br. Summ. J. 7-8.) Thereafter, through correspondence to Plaintiff dated October 29, 2008, November 20, 2008, and January 23, 2009, Berkshire advised that it was still reviewing the validity of the policies and considering rescission. Plaintiff claims that between June 9, 2008 and January 23, 2009, Berkshire did not take any action or conduct any investigation with respect to rescission of the policy, instead leaving it to the legal department. (Pl.'s Br. Summ. J. 7-8.)

On January 20, 2010, William Hager, who is a licensed attorney and certified reinsurance arbitrator, issued a report on Plaintiff's behalf, concluding that Berkshire had breached its obligations and responsibilities in handling Plaintiff's claim. Hager opined that Berkshire had no reason to deny Plaintiff's claim as there was no information in the file demonstrating an "intentional act" by

Plaintiff to deceive. The report further indicates that Berkshire acted in bad faith by failing to provide a prompt claim investigation. (Pl.s Br. Summ. J. 9; Hager Rpt.)

D. Procedural History of Litigation

Plaintiff filed a complaint in the Philadelphia Court of Common Pleas on January 7, 2009, seeking money damages for the disability income benefits. Specifically, Plaintiff alleged: (1) violation of the Covenant of Good Faith and Fair Dealing (bad faith); (2) violation of the Unfair Trade Practices and Consumer Protection Law; and (3) breach of contract. On February 11, 2009, Defendants filed a notice of removal to the Eastern District of Pennsylvania, and on March 27, 2009, Defendants filed their Answer and Counter-Claim for rescission.

Currently before the Court are Defendants' motion for summary judgment on Plaintiff's complaint and on their counter-claim for declaratory relief, as well as Plaintiff's counter motion for partial summary judgment. Also before the Court is Defendants' Motion in Limine to Exclude the Testimony of Plaintiff's Expert William Hager.

II. **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party moving for summary judgment has the initial burden of supporting its motion with evidence that would be admissible in a trial. Id. If this requirement is satisfied, the burden shifts to the non-moving party to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party may meet this burden either by submitting evidence that negates an essential element of the moving party's claims, or by demonstrating that the movant's factual evidence is insufficient to establish an essential element of its claims. Celotex, 477 U.S. at 331.

The non-moving party cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather, must present evidence from which a jury could reasonably find in its favor. Ridgewood Bd. of Edu. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999). In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).

Where cross-motions for summary judgment have been filed, as is the case here, the following standards apply:

> In cases where the parties filed cross-motions for summary judgment, each side essentially contends that no issue of material fact exists from its perspective. We must, therefore, consider each motion for summary judgment separately. The standards under which we grant or deny summary judgment do not change because cross-motions are filed. Each party still bears the initial burden of establishing a lack of genuine issues of material fact. Such contradictory claims do not necessarily guarantee that if one party's motion is rejected, the other party's motion must be granted.

Williams v. Philadelphia Housing Authority, 834 F.Supp. 794, 797 (E.D.Pa. 1993) aff'd 27 F.2d 560 (3d Cir. 1994) (citations omitted).

**III. ANALYSIS**

Defendants argue that as a matter of law, Berkshire may properly rescinded Plaintiff's disability insurance policies based on the numerous false misrepresentations made by Plaintiff in his application. Defendants contend that the two year incontestability provision in the disability policy is inapplicable as there is an exception to the provision where fraudulent misrepresentations have been made.

Plaintiff responds that a heightened standard of scrutiny should be applied to his alleged fraudulent misrepresentations because Berkshire is seeking to rescind the disability insurance policy outside of the contestability period. Plaintiff argues that Berkshire cannot establish such fraud and therefore, Berkshire is not entitled to rescission as a matter of law. Plaintiff further claims that he has produced sufficient evidence demonstrating that Berkshire acted in bad faith in investigating his claim.

A.  The Incontestable Provisions

At the outset, I note that it is undisputed that the date of expiration of the contestability period set forth in the disability insurance policies was February 5, 2007.[6] Berkshire filed its claim for rescission on March 27, 2009, over two years after the contestability period, but relies on the fraud exception to justify rescission beyond the two years.

Pennsylvania law mandates that insurance policies include an incontestability provision. 40 P.S. § 753(A). The prescribed incontestability language reads: "After three years from the date of

_____

[6]The expiration for the incontestability period under the original policy, February 5, 2007, did not change with the issuance of the Future Increase Option Policy. (See FIO Policy, "Endorsement Amending 'Incontestable' Provisions: . . . the time period stated in the incontestable provision of this policy will be measured from the effective date . . . of the policy to which the Future Increase Option Rider is attached.")

issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such three year period." 40 P.S. § 753 (A)(2)(a). Changes can be made to this language as long as the changes are favorable to the insured and approved by the Commissioner. 40 P.S. § 753(A).

Both the Disability Policy and the Future Increase Option Policy issued to Plaintiff provided that: "This policy will be incontestable as to the statements, *except fraudulent statements*, contained in the application after it has been in force for a period of two years during your lifetime." (Defs.' Mot., Ex. 1 Nalty Decl., Exs. A, E.) (emphasis added.) This language was approved by the Pennsylvania Commissioner for sale and issuance in the State. (Defs.' Mot., Ex. 4, Laura H. Rotenberg Decl., Ex. A.) Defendants argue that where there are fraudulent statements in a disability policy application, the policy is contestable beyond two years.

Plaintiff does not dispute that the fraud exception allows rescission after two years. He asserts, however, that where an insurer contests the policy beyond the contestability period, the insurer is faced with a "higher burden" to establish fraud. Specifically, Plaintiff argues an insurer should be required to establish an intent to deceive such that the insured's conduct: (1) rises to the level of deception akin to an imposter; and (2) could not be detected through the normal investigation process. (Pl.'s Br. Summ. J. 16, 26.) Plaintiff acknowledges that the Pennsylvania Supreme Court has not adopted this standard since the passage of 40 P.S. § 753, but forecasts that the Supreme Court will likely apply this heightened standard. In support of this prediction, Plaintiff cites to numerous cases, however none of these cases are applicable to the question before the Court.

First, Plaintiff cites to a number of life insurance cases where courts would not permit

rescission after the contestability period passed. <u>See</u> <u>e.g.</u> <u>Fireman v. Eureka Life Ins. Co.</u>, 279 Pa. 507, 509 (1924). Aside from the fact that Plaintiff's life insurance policy is not at issue here, these cases are inapplicable as Pennsylvania law does not permit an incontestability clause in a life insurance contract to contain a fraud exception. 40 P.S. § 510(c).

Plaintiff also cites to cases where rescission of a life insurance policy after the contestability period was considered and points out that rescission was only permitted where the fraud was particularly egregious, such as where an insurer was able to establish that an imposter was used to deceive the insurer to issue the policy. <u>See</u> <u>Ludwinski v. John Hancock Mutual Life Ins. Co.</u>, 178 A. 28, 30-31 (Pa. 1935); <u>Petaccio v. N.Y. Life Ins. Co.</u>, 189 A. 697, 702 (Pa.Super. 1939). The "imposter" cases, however, are also inapplicable to the case before me as the courts in those cases did not establish a higher burden for the insurer, but rather determined that because the contract was formed between the insurer and someone other than the named insured, no contract had been formed. <u>See</u> <u>Unity Mutual Life Ins. Co. v. Moses</u>, 621 F.Supp. 13, 16 (E.D.Pa. 1985).[7]

Having found that the contestable period is not limited to two years where there are fraudulent statements, and that there is no support for the heightened standard of proof suggested by Plaintiff, I now consider whether Defendants have established that there are no material facts as to whether Plaintiff knowingly made fraudulent, material statements in the application.

---

[7] Plaintiff also cites to <u>Brosnan v. Provident Life & Accident Ins. Co.</u>, 31 F.Supp.2d 460 (E.D.Pa. 1998), a disability case decided after the passage of 40 P.S. § 753 in which the court decided that the insurer could not rescind a policy after the contestability period passed. Plaintiff alleges that <u>Brosnan</u> stands for the proposition that there is a heightened standard of scrutiny that applies to alleged fraudulent statements where the challenge occurs after the contestability period. However, <u>Brosnan</u> is also inapplicable as the disability policy at issue there did not contain a fraud exception in its incontestability provision. (31 F.Supp.2d at 466).

B. Rescission

Under Pennsylvania law, a life insurance policy is void <u>ab</u> <u>initio</u> where the applicant's representations are: 1) false; 2) made fraudulently or otherwise made in bad faith; and 3) material to the risk assumed. <u>Burkert v. Equitable Life Assur. Soc'y of America</u>, 287 F.3d 293, 296-97 (3d Cir. 2002) (citing <u>Matinchek v. John Alden Life Ins. Co.</u>, 93 F.3d 96, 102 (3d Cir.1996) (citations omitted)). The insurer must prove these elements by clear and convincing evidence. <u>Northwestern Mut. Life Ins. Co. v. Babayan</u>, 430 F.3d 121, 129 (3d Cir. 2005).[8]

(1) <u>Were the Respresentation(s) False?</u>

Because Plaintiff does not dispute that the answers in his application were false, the first element is met. As previously noted, Plaintiff stated on his disability insurance policy application, medical representation form and health form that he did not have a drug problem, and that he had not undergone treatment for drugs, or for emotional problems. (Pls.' Br. Summ. J. 5; Defs.' Br. Summ. J. 2, 6-7, 15.) In his deposition, Plaintiff acknowledged that at the time he completed the application he had in fact abused drugs, undergone treatment for drug abuse and had been and was continuing to undergo treatment for emotional problems. (Sadel Dep. 102-05.) Thus, the undisputed record establishes that the application for disability insurance contained false representations.

---

[8] I note that other courts have applied slight variations of this standard. <u>See</u> <u>Northwestern Mut. Life Ins. Co. v. Babayan</u>, 430 F.3d 121, 129 (3d cir. 2005) (citing <u>Justofin v. Metropolitan Life Ins. Co.</u>, 372 F.3d 517, 521 (3d Cir.2004) (citing <u>Coolspring Stone Supply, Inc., v. Am. States Life Ins. Co.</u>, 10 F.3d 144, 148 (3d Cir.1993))) (In order to void an insurance policy under Pennsylvania law, an insurer has the burden of proving, by clear and convincing evidence, that (1) the insured made a false representation; (2) the insured knew the representation was false when it was made or the insured made the representation in bad faith; and (3) the representation was material to the risk being insured).

(2) <u>Were the Representations Fraudulent or Made in Bad Faith?</u>

As previously noted, the Disability Policy at issue is only contestable after two years where there were "fraudulent" statements. "An answer known by the insured to be false when made is presumptively fraudulent." <u>Hager v. North Am. Co. for Life & Health Ins.</u>, 1988 WL 62195 (E.D.Pa. June 14, 1988) (citing <u>Evans v. Penn Mutual Life Ins. Co.</u>, 322 Pa. 547, 553, 186 A.2d 133 (1936)); <u>Shafer v. Hancock Mut. Life Ins. Co.</u>, 410 Pa. 394, 399 (1963) (finding fraud as a matter of law "where false answers are shown to have been given by the insured under such circumstances that he must have been aware of their falsity"); <u>Adams</u>, 2003 WL 23018922, at * 10 (citing <u>Silverman v. Bell Savings and Loan Ass'n</u>, 367 Pa.Super. 464, 533 A.2d 110, 113 (1987) ("It is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false.")) In such cases, the "court may direct a verdict or enter judgment for the insurer." <u>Shafer</u>, 410 Pa. at 399.

Here, Plaintiff acknowledged at deposition that his responses of "no" to the straight-forward questions of whether he had abused drugs, had treatment for drugs, and had treatment for emotional problems, were fraudulent misrepresentations.[9]  Plaintiff explains that he did not believe it was

---

[9]  Plaintiff was asked about his responses to the three questions during his deposition: Question 5G(10) read: "In the last ten years, have you had, been treated for or received consultation or counseling for anxiety depression, nervousness, stress, mental or nervous disorder, or other emotional disorder." Plaintiff responded "no." When asked about this, he stated that: "Upon reflection, it should have been "yes." Counsel asked: "at the time that you filled out the application, the answer to that question you gave was "no," but that you feel now it should have been "yes." Is that a correct statement?" Plaintiff answered "Yes."

Question 5K(I) read: "Have you ever used stimulants, hallucinogens, narcotics or any other controlled substance?" Plaintiff responded "no." Counsel asked: "And should that question have been answered 'yes?'" Plaintiff answered: "It should have been. Upon reflection, it should have been answered 'yes.'"

Question 5-K, II read "Have you ever had or been advised to have counseling or treatment for alcohol or drug use." Plaintiff responded "no." Counsel asked: "And should that question

14

necessary to identify his prior use of drugs because he considered the drug abuse and counseling to be a small matter from his past that was under control. He claims that at the time he completed the application, it did not occur to him to respond "yes" as he "breezed through" the questions. (Pl.'s Br. Summ. J. 26; Sadel Dep. 110.)

These explanations do not, however, vitiate the fact that Plaintiff knowingly provided false answers. The undisputed facts reflect that Plaintiff had fifty-seven individual treatment sessions for drug or emotional issues between September 2002 and the day he signed the disability application on January 18, 2005. He had an individual session on January 12, 2005 - six days prior to signing the disability application and health form. Further, in January 2005, at the very time when Plaintiff responded "no" to the question of whether he had ever had treatment or counseling for any emotional issues, including stress, he was receiving ongoing treatment for a number of issues, including stress. (Sadel Dep. 111-12.) Plaintiff had seventy-eight group sessions between May 2003 and January 12, 2005. He had a group session on January 12, February 9, and February 16, 2005. He signed the disability application on January 18, 2005. He made the same denials on February 14, 2005 when he signed the medical representations form. (Defs.' Br. Summ. J. 12; Defs.' St. of Facts ¶¶ 119-25.) All of these facts are undisputed.

Based on this evidence, I find that no reasonable fact-finder could find that Plaintiff did not know that he had provided fraudulent statements.

Finally, on the second element, I note that 40 P.S. § 757 provides instruction regarding "false statements" in insurance applications, and reads: "The falsity of any statement in the application for

---

have been answered 'yes?'" Plaintiff: "It should have been answered 'yes,' it looks like." (Sadel Dep. 102-05.)

any policy covered by subdivision (b) of this article shall not bar the right to recovery thereunder, unless such false statement was made with actual intent to deceive, or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer." Therefore, "a policy may be avoided when the false representation has either been made with intent to deceive, or in the alternative, when it materially affected the acceptance of the risk or the hazard assumed by the insurer." Connecticut Mut. Life Ins. Co. v. Wyman, 718 F.2d 63, 67 (3d Cir. 1983) (citing Briggs v. United Services Life Insurance Co., 80 S.D. 26, 117 N.W.2d 804, 808 (1962)). As explained infra, because I find that the misrepresentations were material, Defendants need not prove intent to deceive under this statute. See also Hager, 1988 WL 62195 at *3 ("[S]ince there is no serious dispute as to the insured's knowledge of the material falsities contained in the application, there is no need for a jury determination as to whether [the insured] 'intended to deceive' the defendant-insurer.")

(3) Were the Fraudulent Misrepresentations Material to the Risk?

I next examine whether the misrepresentations were material to the risk being insured. "Materiality is generally considered a mixed question of fact and law for the jury, but if 'reasonable minds cannot differ on the question of materiality,' the court may resolve the issue at the summary judgment stage." Jung, 949 F.Supp. 357 (citations omitted). Information is material "if knowledge or ignorance of it would influence the decision of the issuing insurer to issue the policy, or the ability of the insurer to evaluate the degree and character of risk, or the determination of the appropriate premium rate." Id. A misrepresentation can be material to the risk assumed by the insurer even if it is not related to the loss actually incurred. American Franklin Life Ins. Co. v. Galati, 776 F.Supp. 1054, 1060, n. 9 (E.D.Pa. 1991)(citations omitted).

Defendants argue that Plaintiff's history of drug abuse and emotional problems were material. The court in Jung 949 F.Supp. at 357, concluded that the insurer had met the materiality prong of the test as a matter of law where the insurer presented "uncontradicted deposition testimony of its employees" that the misrepresentation was material. Here, the underwriting guidelines used by Berkshire state that a policy will not be issued to anyone who abuses controlled substances within five years of the date of the application. (Audette Declaration, Exhibit A.) Further, Charles Audette, Berkshire's Chief Underwriter, testified that there is no situation in which someone with a history of abuse within five years would receive a policy. (Audette Dep. 31.) These statements are uncontradicted. (Defs.' Br. Summ. J. 13-14, 16.)

Moreover, in addition to the drug abuse, Berkshire would not have issued the same policy had Plaintiff's attachment disorder been disclosed. Audette testified that a modified coverage might have been possible but the policy Plaintiff received would not have been issued in the same form. (Defs.' Br. Summ. J. 13-14, 16; Defs.' St. of Facts ¶ 132-33.)

I conclude that the clear, convincing, and undisputed evidence demonstrates that Plaintiff's misrepresentations about drug abuse and counseling for emotional problems, including his attachment disorder, were material because it is undisputed that knowledge of either would have caused Berkshire to decline the risk or to issue a different policy. See Adams, 2003 WL 23018922 at * 8 ("It is beyond dispute that representations concerning an insured's medical history and health related issues are material to the risk assumed by a disability insurance carrier"); Hager, 1988 WL 62195 at *2 (citing Van Riper v. Equitable Life Assurance Society, 561 F.Supp. 26, 31 (E.D.Pa.1982) ("information concerning the insured's prior treatment at a hospital and inquiries regarding the insured's past treatment by a physician and past illnesses and ailments are material as

a matter of law")).

Because there are no material facts for a fact-finder to consider regarding the three rescission elements, I find as a matter of law that rescission was justified.

C. Future Increase Option (FIO) Policy

According to Defendants, Plaintiff would not have received the FIO policy if he had not qualified for the original Disability Policy. (Defs.' St. of Facts 5, 6.) Charles Audette testified that Plaintiff only had the option to purchase the FIO Policy because he had purchased the FIO Rider as part of the Disability Policy. If Plaintiff had not qualified for the Disability Policy, he would not have received the FIO Rider and therefore would not have been able to purchase the FIO Policy. Therefore, Audette explained that if the Disability Policy is void, the FIO Policy is also void. (Audette Declaration ¶ 2.) Plaintiff's response to these facts are "Denied as stated. The policies are documents which speak for themselves." (Pl.'s Resp. to Defs.' St. of Facts ¶ 6.)

A party moving for summary judgment has the initial burden of supporting its motion with evidence that would be admissible in a trial. Anderson, 477 U.S. at 248. If this requirement is satisfied, the burden shifts to the non-moving party to "set out specific facts showing a genuine issue for trial" by submitting evidence that negates an essential element of the moving party's claims, or by demonstrating that the movant's factual evidence is insufficient to establish an essential element of its claims. Celotex, 477 U.S. at 331. Plaintiff has not submitted evidence to challenge Defendants' claim that the FIO policy is void. Further, I find Audette's declaration to be supported by the documents. The Future Increase Option Rider states: "This rider is part of this policy and subject to all its conditions." (Defs.' Ex. 1, Ex. A, Plaintiff's Disability Income Policy, Cypress 02089.) Therefore, Berkshire's rescission of the Disability Policy - which renders the contract void -

also rescinds the FIO Policy.[10]

D.  Bad Faith and Punitive Damages

Under Pennsylvania law, in order to succeed on a bad faith claim, the insured must present clear and convincing evidence that the insurer (1) lacked a reasonable basis for denying benefits under the policy and (2) knew of or recklessly disregarded its lack of reasonable basis in denying the claim.  Northwestern Mut. Life Ins. Co. v. Babayan   430 F.3d 121 (3d Cir. 2005) (citing Keefe v. Prudential Property and Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000); Terletsky v. Prudential Property and Casualty Insurance Co., 437 Pa.Super. 108, 649 A.2d 680, 688 (1994)).  Although the insurer's conduct need not be fraudulent, "mere negligence or bad judgment is not bad faith." Id. (citing Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (2004)).  The insured must show that "the insurer breached its duty of good faith through some motive of self-interest or ill will."  Id.  The insured's burden in opposing summary judgment is "commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial."   Id. (citing Kosierowski v. Allstate Ins. Co., 51 F.Supp.2d 583, 588 (E.D.Pa.1999) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))).

Further, "Pennsylvania law provides that a defendant must have engaged in 'outrageous' or 'intentional, reckless or malicious' conduct to sustain a claim for punitive damages."  Boring v. Google Inc., 362 Fed.Appx. 273, 282 (3d Cir. 2010) (citing Feld v. Merriam, 506 Pa. 383, 485 A.2d 742, 747-48 (1984)).

Plaintiff argues that he has produced sufficient evidence for the fact-finder to determine that

---

[10] Because I have decided that Berkshire can rescind its contracts with Plaintiff, there is no basis for a breach of contract claim.   That claim (Count III) is therefore dismissed.

Berkshire acted in bad faith in investigating his claim for disability income insurance benefits and that he is entitled to punitive damages. In support of this position, Plaintiff relies heavily on the expert opinion of William Hager, a licensed attorney and certified reinsurance arbitrator. Hager opined on several matters including that Berkshire showed a lack of good faith in that (1) there was no reason for the claim denial; (2) the "grotesque delay in adjusting the claim" was without justification; and (3) Berkshire inappropriately threatened to rescind Plaintiff's policy. (Hager Rpt. 6-8.)

"The mere presence of an expert opinion supporting the non-moving party's position does not necessarily defeat a summary judgment motion; rather, there must be sufficient facts in the record to validate that opinion." Kosierowski v. Allstate Ins. Co., 51 F.Supp.2d 583 (E.D.Pa. 1999) (citing Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1198-99 (3d Cir. 1995)). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." Allstate, 2008 WL 4104542 *5 (citing Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1198-99 (3d Cir. 1995)).

For several reasons, I conclude that Hager's opinions fail to create a genuine issue of fact or provide clear and convincing evidence of bad faith. First, Hager opines that Berkshire engaged in unacceptable delay in handling Plaintiff's claim and cites to a nine month gap in the file between August 24, 2007 and June 9, 2008. He opined that Berkshire was still investigating as of June 9, 2008 "without an acceptable reason for the delay . . . There were no extenuating circumstances to account for the delay." (Hager Rpt.) This conclusion completely ignores the undisputed record. Plaintiff filed his claim on August 16, 2007, and on August 20, 2007, Berkshire requested Plaintiff

fill out a claim form which was necessary to process his request. Plaintiff did not provide the form until four months later, on December 24, 2007. Berkshire then had difficulty obtaining information from Plaintiff's therapist May, who initially refused to provide her records. Berkshire did not receive her information until April 26, 2008 and May 5, 2008. (Defs.' St. of Facts ¶¶ 11, 14, 21-28.) Berkshire claims it then sought to obtain information on whether Plaintiff was "totally disabled" under the policy as he claimed and sought financial information, none of which was forthcoming. (Defs.' St. of Facts ¶¶ 11, 14, 21-28.) This timetable in no way reflects an unreasonable delay by Berkshire.

Second, Hager's report fails to address Plaintiff's delays in providing Berkshire relevant information. It also completely ignores the undisputed evidence that Plaintiff misrepresented several answers on his insurance applications. By failing to take into account Plaintiff's admission that he lied on his application and Plaintiff's role in the delayed investigation, Hager's report misses much of the context of this case and therefore fails to create genuine issues of fact.[11]  Kosierowski v.

_____

[11] Hager's report also includes inadmissible legal opinions about Pennsylvania insurance law. For example, Hager opines that Berkshire failed to provide a satisfactory basis for denying Plaintiff's claims as there was no information on file to demonstrate an "intentional act" by Plaintiff to deceive Berkshire. "As a general rule an expert's testimony on issues of law is inadmissible." Vargas, 2008 WL 4104542 at *5 (quoting Whitmill v. City of Phila., 29 F.Supp.2d 241, 246 (E.D.Pa.1998)).

Hager also claims to apply "industry standards" and the Market Regulation Handbook that he alleges is used by Pennsylvania Department of Insurance (PDOI). However the PDOI uses the Unfair Insurance Practices Act (UIPA) and the Unfair Claims Practices Regulations (UCPR) to evaluate the claims handling practices of insurance companies. 40 P.S. §§ 1171.1 & 1171.5(10)); 31 Pa.Code § 146.1-146.10. Further, the United States District Courts in Pennsylvania have held that references to standards under UIPA are irrelevant in a bad faith action in Pennsylvania where the Pennsylvania Superior Court has established a definitive two prong test for determining bad faith in Terletsky v. Prudential Property and Casualty Insurance Co. Moss Signs, Inc. v. State Auto. Mut. Ins. Co., 2008 WL 892032 (W.D.Pa. Apr.2, 2008) (finding that while the "UIPA and [Unfair Claims Settlement Practices] provide the standard by which an insurer's actions should be measured, we find that any violations thereof are irrelevant

21

<u>Allstate Ins. Co.</u>, 51 F.Supp.2d 583, 596 (E.D.Pa.1999). An expert report does not raise a genuine dispute of material fact where the report did not consider the context of the case.

Because I find Hager's Report fails to create a genuine issue of fact on bad faith, I look to the remaining record to determine if Defendants acted in bad faith in investigating Plaintiff's claim. Noting that the undisputed facts establish that much of the delay in the investigation process was due to Plaintiff's own lack of cooperation, I find that the investigation was not conducted in bad faith.

Plaintiff further argues that Berkshire acted in bad faith in that it had no reasonable basis to deny him benefits under the disability policies. Because I conclude that, based on the record's undisputed evidence, Plaintiff provided fraudulent misrepresentations on his application and on subsequent documents, Plaintiff cannot establish a bad faith claim on this ground. <u>See</u> <u>Adams</u>, 2003 WL 23018922, at * 10

Having found no bad faith, I will grant Defendants' motion for summary judgment as to Count I.[12]

E. <u>Parent Corporation</u>

Plaintiff claims it has produced sufficient evidence for a fact-finder to determine that Guardian can be held liable as a parent corporation for the illegal activities of its wholly owned subsidiary. (Pl.'s Br. Summ. J. 29-30.) Because I have not found that Berkshire engaged in illegal

in determining whether Defendant acted in bad faith under Pennsylvania law"); <u>Oehlmann v. Metro. Life Ins. Co.</u>, 2007 WL 4563522 (M.D.Pa. Dec. 21, 2007).

[12] I will also dismiss Plaintiff's claim under the Unfair Trade Practices and Consumer Protection Law: "An Act prohibiting unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, giving the Attorney General and District Attorneys certain powers and duties and providing penalties," 73 P.S. § 201-1, which was enumerated in the Complaint (Count II) but not mentioned thereafter.

activities, I need not determine whether Guardian can be held liable for the activities of its subsidiary corporation.

IV.     **CONCLUSION**

Having found that Plaintiff made material fraudulent misrepresentations in his application for a disability income insurance policy, Defendant Berkshire is entitled to rescission of that policy and the FIO policy that was issued as an option in that contract.

Our Order follows.